### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

DAIAN ONAKA, TORSHIA WOODS,
SHELI ZELLER, MARGO FERGUSON,
and EVA BAILEY, individually and on behalf of
all others similarly situated,

      Plaintiffs,                     Case No. 1:21-cv-10665-PAC
                                         Honorable Paul A. Crotty

v.

SHISEIDO AMERICAS CORPORATION,

      Defendant.

_____/

### AMENDED CLASS ACTION COMPLAINT

Plaintiffs Daian Onaka, Torshia Woods, Sheli Zeller, Margo Ferguson, and Eva Bailey ("Plaintiffs") bring this Amended Class Action Complaint against Defendant Shiseido Americas Corporation ("Shiseido" or "Defendant"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### NATURE OF THE ACTION

1.      This is a civil class action brought by Plaintiffs on behalf of all consumers who purchased bareMinerals products, which are marketed as clean and natural beauty products for normal, everyday use, but which contain harmful per- and polyfluoroalkyl substances ("PFAS") (collectively, "PFAS Makeup" or "Products").[1]

_____

[1] The action concerns all bareMinerals products that contain PFAS, including but not limited to, BAREPRO® Performance Wear Liquid Foundation SPF 20, BAREPRO® 16-Hr Full Coverage Concealer, BAREPRO® Longwear Lipstick, Original Liquid Mineral Foundation Broad Spectrum SPF 20, GEN NUDE® Matte Liquid Lipstick. As alleged herein, Defendant conceals the inclusion

2.     The bareMinerals brand differentiates itself in the highly competitive beauty market by uniformly advertising its products as being "free of harsh chemicals and unnecessary additives, and full of . . . natural minerals,"[2] "rigorously safety tested," "pure"[3] and "clean, conscious beauty that's good to your skin, good for the community and good for the planet."[4] In fact, Defendant describes itself as the "Creators of Clean Beauty"[5] and "the original creators of mineral makeup and clean beauty."[6] Defendant proclaims that "bareMinerals started the clean beauty revolution when it launched its best-selling mineral foundation in 1995, and since then, the brand has continued to create clean, cruelty-free makeup . . ."[7]

3.     As one of the largest cosmetic companies in the world, with a portfolio including dozens of high-end brands, Defendant knows that when it comes to marketing and labeling, words matter. Defendant intentionally joins the words "bare" and "minerals" as its brand name to convince consumers that its products are clean and natural. The Merriam-Webster definition of "bare" is "having nothing left over or added" and connotes something that is basic or simple— without addition. The Merriam-Webster definition of "mineral" means "a naturally occurring homogonous substance," and minerals are commonly known as substances essential for health and meeting basic nutritional requirements. Reasonable consumers, therefore, fairly and reasonably understand that a product named bareMinerals, which is marketed as clean and natural, would not

---

of PFAS in the Products from consumers. Accordingly, discovery will reveal the exhaustive list of substantially similar bareMinerals products that are included in this action.
[2] *About bareMinerals*, BAREMINERALS,  https://www.bareminerals.com/discover/about-us.html (last visited Nov. 27, 2021).
[3] *Id.*
[4] *Our Purpose*, BAREMINERALS, https://www.bareminerals.com/our-purpose/ (last visited Nov. 27, 2021).
[5] *About bareMinerals*, *supra* note 2.
[6] *bareMinerals Brand*, SHISEIDO, https://corp.shiseido.com/en/brands/bareminerals/ (last visited Nov. 27, 2021).
[7] *Id.*

contain human-made chemicals like PFAS. As a result of its brand name and marketing campaign, over the course of several decades, Defendant's bareMinerals brand of cosmetics has unfairly gained the trust of consumers, who reasonably believe that bareMinerals products, including the PFAS Makeup, are made without non-clean or non-natural ingredients, such as PFAS. Consumers, including Plaintiffs, relied upon the "bareMinerals" name in purchasing the PFAS Makeup.

4.      Globally, the clean beauty market is estimated to reach $22 billion by 2024, becoming a fast-growing category within the cosmetics industry.[8] It is no surprise that cosmetic companies, like Defendant, are eager to garner market share in the incredibly lucrative and expanding "clean beauty" movement.

5.      The clean beauty movement has caused a revolution in the beauty industry and is the result of increased demand for "clean" products that contribute to their overall health and wellness goals. Over the last 10-15 years, clean beauty products have emerged as key players in the ever-growing cosmetics market, leading companies, such as Defendant, to set themselves apart with attractive marketing claims, even if those claims are unsupported by what is actually in the product.

6.      Defendant knows that consumers are focused on what they put on their face and how the products they use impact the environment.[9]

7.      Consumers pay the price they do—and Plaintiffs paid the price they did—for bareMinerals' self-proclaimed "clean beauty" makeup based upon Defendant's pervasive

---

[8] Kristin Larson, *Shopper Demand for Clean Beauty and Increased Transparency Continues*, FORBES.COM (June 30, 2021, 6:47 PM) https://www.forbes.com/sites/kristinlarson/2021/06/30/shopper-demand-for-clean-beauty-and-increased-transparency-continues/.

[9] *The Clean Beauty Trend is More Than Skin Deep*, NIELSENIQ (July 29, 2021) nielseniq.com/global/en/insights/education/2021/the-clean-beauty-trend-is-more-than-skin-deep/.

marketing that centers on the importance of using "clean" and "natural" cosmetics for makeup application.

8.      Through bareMinerals' "clean beauty" campaign, Defendant capitalizes on ever increasing consumer demand for "clean" beauty products, which are generally understood to have eliminated ingredients shown or suspected to be harmful to human health. This generally accepted meaning of "clean" is supported by bareMinerals own descriptions of "clean beauty," which refers to its products as "contain[ing] only what's needed, and nothing else,"[10] and "100% free" of various chemicals known to cause adverse health effects.[11]

9.      Defendant's marketing campaign is replete with examples of its intention to convince consumers that its bareMinerals brand is a "clean," natural mineral makeup that is good for skin and contains "only what's needed, and nothing else."[12]

10.     Consumers expect the ingredient listing on the packaging and labels of cosmetics like the PFAS Makeup to accurately disclose all of the product's ingredients. However, Defendant does not disclose that the Products contain PFAS, a chemical which is entirely inconsistent with its clean beauty campaign, the disclosure of which would inevitably impact its sales and standing in the rapidly growing clean beauty market. Defendant's failure to disclose the presence of PFAS in the Products is driven by Defendant's desire to maximize sales revenue.

11.     In reality, the PFAS Makeup is not clean or natural as it contains potentially harmful chemicals that are in no way "clean" or "natural."

12.     The presence of PFAS in the Products is inconsistent with the bareMinerals brand name and its uniform, pervasive clean beauty marketing and advertising campaign, which leads

---

[10] *Our Purpose*, *supra* note 4.
[11] *Clean Beauty Makeup*, BAREMINERALS, https://www.bareminerals.com/our-purpose/look-good/clean-beauty/ (last visited Nov. 27, 2021).
[12] *Id.*

4

reasonable consumers to believe that the Products do not contain potentially harmful chemicals that pose a risk to humans and the environment. No reasonable consumer would deem the PFAS Makeup clean or natural if they knew the Products contain harmful PFAS.

13.     Further, the presence of PFAS in the PFAS Makeup renders it adulterated, misbranded, and illegal to sell under federal and state law.

14.     Defendant's misconduct is uniform and widespread. Defendant formulates, designs, manufactures, markets, advertises, distributes, and sells its bareMinerals-branded PFAS Makeup to consumers throughout the United States, including in the State of New York.

15.     Defendant distributes and sells its bareMinerals line of cosmetics, including the PFAS Makeup, on its bareMinerals website, in its bareMinerals retail stores, and through various authorized brick-and-mortar and online retailers such as ULTA, Sephora, Macy's, Nordstrom and Amazon.

16.     The PFAS contained in the PFAS Makeup is not disclosed by Defendant on its website, in its ingredients, on its packaging, or in any other manner; however, Plaintiffs tested each of the Products they purchased, and all of the Products contained undisclosed PFAS.

17.     Plaintiffs retained a third-party independent lab, which is accredited by the American Association for Laboratory Accreditation (A2LA), to conduct this testing.

18.     On September 9, 2021, Plaintiffs conducted testing on two separate samples of Defendant's BAREPRO® Performance Wear Liquid Foundation SPF 20, which revealed significant levels of organic fluorine in both samples.

19.     On October 26, 2021, Plaintiffs conducted additional testing on two separate samples of Defendant's BAREPRO® 16-Hr Full Coverage Concealer, BAREPRO® Longwear

Lipstick, Original Liquid Mineral Foundation, GEN NUDE® Matte Liquid Lipstick, which revealed significant levels of organic fluorine in every sample tested.

20.     There are more than 9,000 PFAS chemicals currently in existence.[13] Accordingly, it is impractical, if not impossible, for scientists and researchers to test for the presence of each of these 12,000 chemicals in any particular sample. Organic fluorine has recently emerged as an indicator that encompasses the total content of both known and unknown types of PFAS, unlike traditional targeted analyses that can reliably quantify only a few dozen known PFAS that have commercially available analytical standards.[14]

21.     Because the presence of organic fluorine in a sample reliably indicates that the sample contains man-made PFAS, this method has been widely adopted, including by the state of California in its regulation of PFAS in consumer products. *See* Cal. Health & Safety Code § 109000.

22.     The presence of PFAS in the PFAS Makeup has recently been identified in several products, including in a recent study conducted by scientists from the University of Notre Dame and other universities, in collaboration with the Green Science Policy Institute, who found PFAS in a number of cosmetics purchased between 2016 and 2020, including more than three-quarters of waterproof mascara, almost two-thirds of foundations and liquid lipsticks, and over half of the eye and lip products ("the PFAS Makeup Study") (attached hereto as Exhibit A).[15]

23.     Following this PFAS Makeup Study, Plaintiffs conducted independent third-party testing of the bareMinerals PFAS Makeup products. Similar to the findings in the Notre Dame PFAS Makeup Study, independent third-party testing conducted by Plaintiffs, which tested

---

[13] https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last visited Mar. 30, 2023).
[14] https://pubs.acs.org/doi/10.1021/acs.est.2c05198 (last visited Mar. 30, 2023).
[15] https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240

bareMinerals foundation and face products (defined as powdered foundation, powders, blush, highlighters, bronzers, primers, finishing and priming sprays), confirmed the presence of PFAS.

24.     Notably, the PFAS Makeup Study determined that raw ingredients in cosmetics are frequently treated with PFAS by suppliers in order to increase their hydrophobic properties, which improve the durability and wear of applied cosmetics. Based on their findings, the PFAS Makeup Study concluded that these ingredients are described on labels using only their *generalized* name. In other words, none of the labels indicate that the individual ingredients in the products are treated with PFAS.

25.     The PFAS Makeup Study identified numerous ingredients which can be treated with PFAS and/or have a fluorinated alternative, including, *inter alia*: mica, talc, silica, Nylon-12, methicone, dimethicone, titanium dioxide, iron oxide, and various coloring agents. Every Product tested by Plaintiffs contains some combination of these ingredients, as shown in the chart below:

| Product | Ingredients Which May be Treated with PFAS |
|---|---|
| BarePro 24 Hour Performance Foundation | Silica, Peg-10 Dimethicone, Methicone, Titanium Dioxide, Iron Oxides |
| Original Liquid Mineral Foundation | Titanium Dioxide, Iron Oxides |
| Gen Matte Nude Lipcolor | Nylon-12, Caprylyl Methicone, Mica, Blue 1 Lake (Ci 42090), Yellow 5 Lake (Ci 19140), Iron Oxides (Ci 77491, Ci 77492, Ci 77499), Red 28 Lake (Ci 45410), Red 33 Lake (Ci 17200), Red 7 Lake (Ci 15850), Titanium Dioxide (Ci 77891) |
| 16 Hour Full Coverage Concealer | Methicone, Peg-10 Dimethicone, Silica, Titanium Dioxide (Ci 77891), Iron Oxides (Ci 77491, Ci 77492, Ci 77499) |
| BarePro Longwear Lipcolor | Dimethicone, Silica, Mica, Titanium Dioxide (Ci 77891), Iron Oxides (Ci 77491, Ci 77492, Ci 77499), Blue 1 Lake (Ci 42090), Red 6 (Ci |

|  | 15850), Red 7 Lake (Ci 15850), Red 28 Lake (Ci 45410), Red 33 Lake (Ci 17200), Yellow 5 Lake (Ci 19140), Yellow 6 Lake (Ci 15985) |
|---|---|

26.     However, PFAS is not listed as an ingredient on any of the PFAS Makeup products. In fact, on its official website, Defendant affirmatively denies the use of PFAS as an ingredient in any of its products, stating that "All of our products undergo rigorous quality, health, and safety assessments, including ingredient review, and we are confident they are safe for use. We do not use PFAS as an ingredient in any of our products."[16]

anne12345 · 4 months ago

**I read that this product was found to contain PFAs or "Forever Chemicals" in a recent study. Is this still the case? How do I know it is safe to use? I just bought a bottle, got it home but I am now afraid to use it.**

1 answer

**Answer this Question**

bareMInerals Artist · 3 months ago

Hello Anne12345

Thank you for taking the time to share your thoughts and concerns. Consumer health and safety is bareMinerals' top priority. All of our products undergo rigorous quality, health, and safety assessments, including ingredient review, and we are confident they are safe for use. We do not use any PFAS as an ingredient in any of our products.

Helpful?   **Yes · 0    No · 0    Report**

27.     Defendant's concealment of this material information makes its false and misleading marketing even more egregious.

28.     Defendant's misrepresentations are intentional, or otherwise entirely careless, and render the PFAS Makeup worthless or less valuable. If Defendant had disclosed to Plaintiffs and

---

[16] *Foundation*, BAREMINERALS https://www.bareminerals.com/makeup/face/foundation/barepro®-24hr-performance-wear-liquid-foundation-broad-spectrum-spf-20/US83542.html#tab-ingredients (last visited Mar. 31, 2023).

putative Class Members that the PFAS Makeup contained PFAS, Plaintiffs and putative Class Members would not have purchased the PFAS Makeup, or they would have paid less for it.

29.     Alternative formulation, designs and materials were available to Defendant at the time it formulated, designed and manufactured the PFAS Makeup, and such alternative formulations and designs were and are used by other manufacturers to produce and sell clean, natural makeup.

30.     Plaintiffs seek damages and equitable remedies for themselves and for the proposed Classes.

**JURISDICTION AND VENUE**

31.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiffs and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

32.     This Court has personal jurisdiction over Defendant because it is headquartered in this District, has substantial aggregate contacts with this District, including engaging in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of New York.

33.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendant

transacts business in this District, and Defendant has intentionally availed itself of the laws and markets within this District.

## PARTIES

34.    Plaintiff Daian Onaka is a resident and citizen of San Jose, California, who purchased and used the PFAS Makeup within the relevant time period.

35.    Plaintiff Torshia Woods is a resident and citizen of Horn Lake, Mississippi, who purchased and used the PFAS Makeup within the relevant time period.

36.    Plaintiff Sheli Zeller is a resident and citizen of Franklin, Ohio, who purchased and used the PFAS Makeup within the relevant time period.

37.    Plaintiff Margo Ferguson is a resident and citizen of Clifton, New Jersey, who purchased and used the PFAS Makeup within the relevant time period.

38.    Plaintiff Eva Bailey is a resident and citizen of Marion, North Carolina, who purchased and used the PFAS Makeup within the relevant time period.

39.    Defendant Shiseido Americas Corporation is incorporated in Delaware with its principal place of business located at 390 Madison Avenue, New York, NY 10017.

## FACTUAL ALLEGATIONS

### bareMinerals Cosmetics

40.    bareMinerals products, including foundation, lipstick, mascara, and other makeup for the face, eyes, and lips, are sold throughout the United States.

41.    Included among bareMinerals products is the PFAS Makeup, which includes, but is not limited to, BAREPRO® Performance Wear Liquid Foundation SPF 20, BAREPRO® 16-Hr Full Coverage Concealer, BAREPRO® Longwear Lipstick, Original Liquid Mineral Foundation, GEN NUDE® Matte Liquid Lipstick.

42.     bareMinerals products are sold at mass market beauty retailers and department stores in the United States, including ULTA, Sephora, Macy's and Nordstrom, in addition to being sold at bareMinerals' own retail stores. The products are also sold on the bareMinerals website and by other online retailers such as Amazon.

43.     As the self-proclaimed "Creators of Clean Beauty," bareMinerals takes credit for starting "the clean beauty revolution" by launching its best-selling mineral foundation in 1995—a makeup product utilizing just 5 mineral ingredients.[17]

44.     Defendant acquired the bareMinerals brand in 2010. From that time until the present, Defendant has continued to grow—and profit from—bareMinerals' well-established position as a leader in the "clean beauty" market.

45.     Since its introduction into the consumer marketplace, and continuing since Defendant's acquisition, the brand's entire marketing focus has centered on promotion of its "clean" message. For example, it represents that since its 1995 launch it has "continued to create clean, cruelty-free makeup and skincare products that never compromise on performance."[18]

46.     Defendant further states that the Products are "Full of what's good. Free of chemicals" as shown below.[19]

---

[17] *About bareMinerals*, *supra* note 2.
[18] *Id.*
[19] *Id.*



**CREATORS OF CLEAN BEAUTY**

We started the clean beauty revolution when we launched our best-selling mineral foundation in 1995, and since then we've continued to create clean, cruelty-free makeup and skincare products that never compromise on performance. Our good-for-skin formulas are free of harsh chemicals and unnecessary additives, and full of botanical extracts and natural minerals that help improve skin's appearance.

## PFAS

47.     PFAS are a category of highly persistent and potentially harmful human-made chemicals.[20]

48.     While there are thousands of varieties of PFAS chemicals in existence, all PFAS contain carbon-fluorine bonds—one of the strongest in nature—which makes them highly persistent in the environment and in human bodies.[21]

49.     PFAS chemicals are sometimes called "forever chemicals" and have been associated with a variety of negative health effects for humans and the environment.

50.     Humans can be exposed to PFAS through a variety of ways, including ingestion, inhalation, and skin absorption.[22]

---

[20] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited Nov. 27, 2021).
[21] *Per- and Polyfluoroalkyl Substances (PFAS)*, NATIONAL TOXICOLOGY PROGRAM, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html (last visited Nov. 27, 2021).
[22] *Id.*

51.     According to the FDA, PFAS are "intentionally added" to products such as lotions, cleansers, nail polish, shaving cream, foundation, lipstick, eyeliner, eyeshadow, and mascara "to condition, smooth or make skin appear shiny."[23] PFAS are also added to cosmetics to increase their durability and water resistance."[24]

52.     By law, all ingredients contained within cosmetics are required to be listed on the product label, in descending order of magnitude.

53.     Common names for PFAS found in cosmetics include PTFE (polytetrafluoroethylene), perfluorooctyl triethoxysilane, perfluorononyl dimethicone, perfluorodecalin, and perfluorohexane.

54.     In order to assess the potential health and environmental risk of PFAS in cosmetics, a study was conducted in June 2021 entitled "Fluorinated Compounds in North American Cosmetics" (the "Study"). The Study analyzed more than 231 cosmetic products purchased in the United States and Canada to determine the presence of PFAS.[25]

55.     The Study explained likely reasons for the use of PFAS in makeup:

PFAS are used in cosmetics due to their properties such hydrophobicity and film-forming ability, which are thought to increase product wear, durability, and spreadability. Additional claimed benefits are increased skin absorption of the product and improvements in the appearance or texture of skin.[26]

56.     Despite being required by the US Food and Drug Administration to list all ingredients present in cosmetics, the Study found some 88% of the tested products failed to disclose on their labels any ingredients that would explain those chemical markers.

---

[23] Sandee LaMotte, *Makeup may Contain Potentially Toxic Chemicals Called PFAS, Study Finds*, CNN (June 15, 2021, 7:46 PM) https://www.cnn.com/2021/06/15/health/makeup-toxic-chemicals-wellness/index.html.
[24] Heather Whitehead et al., *Fluorinated Compounds in North American Cosmetics*, ENVIRON. SCI. TECHNOL. LETT. (June 15, 2021) https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240.
[25] *Id.*
[26] *Id.*

57.     In order to analyze the presence of PFAS, the Study used a marker for PFAS—the chemical fluorine, which is different than the inorganic fluorine added to drinking water.

58.     "We found fluorine as a surrogate for PFAS was in all sorts of cosmetics. We didn't expect almost every cosmetic to light up like it did," said study author, Graham Peaslee, a professor of physics, chemistry and biochemistry at the University of Notre Dame.[27]

59.     The Study concluded that more than three-quarters of waterproof mascara, nearly two-thirds of foundations and liquid lipsticks, and more than half of eye and lip products had high fluorine concentrations, indicating PFAS were likely present.

60.     In addition, samples from 29 of the products with the highest levels of fluorine were sent to an outside lab for an in-depth analysis that could identify 53 specific PFAS chemicals. The analysis found each of those 29 products contained at least four PFAS chemicals of concern.

61.     In 28 of the 29 products—like the PFAS Makeup here—PFAS chemicals were not disclosed on the label.

**Risks Associated with PFAS in Cosmetics**

62.     "PFAS in cosmetics may pose a risk to human health through direct and indirect exposure, as well as a risk to ecosystem health throughout the lifecycle of these products."[28]

63.     Of particular concern with PFAS utilized in cosmetics "is that these classes of cosmetics are applied close to the eyes and the mouth, which could increase exposure and hence risk due to enhanced absorption and ingestion."[29]

---

[27] LaMotte, *supra* note 20.
[28] Whitehead et al., *supra* note 21.
[29] *Id.*

64.     As skin is the body's largest organ,[30] subjecting it to absorption of PFAS through foundation and concealers is very concerning.

65.     A figure utilized in the Study demonstrates how PFAS in cosmetics are introduced to the human body:



66.     As one blogger noted, in quoting a notable dermatologist:

Unfortunately, the technological innovations that PFAS helped create also came with a price: Serious health effects. Jennifer Herrmann, MD, FAAD, a board certified, fellowship-trained dermatologist and dermatologic surgeon at Moy Fincher Chipps Facial Plastics / Dermatology, says that PFAS may impact 'increased cholesterol, liver inflammation, increased blood pressure in pregnancy, decreased birth rate of children, decreased vaccine response in children, and increased risk of kidney or testicular cancer.'[31]

67.     In 2018, Denmark's EPA performed a "Risk assessment of fluorinated substances in cosmetic products." As noted in the assessment:

This project is part of the Danish Environmental Protection Agency's chemical initiative, with the aim of assessing consumers' exposure to problematic chemistry… The purpose of this project is to build knowledge of fluorinated substances in cosmetic products and to clarify whether the use of cosmetic products containing certain fluorinated substances presents a health risk to consumers. The project focuses on perfluoroalkyl and polyfluoroalkyl substances (PFAS), which

---

[30] Gary Swann, *The Skin is the Body's Largest Organ*, JOURNAL OF VISUAL COMMUNICATIONS IN MEDICINE (Volume 33, November 19, 2010) https://doi.org/10.3109/17453054.2010.525439.
[31] Marie Lodi, *"Forever Chemicals" & Cosmetics: What You Need To Know About PFAS*, ROSE INC, https://www.roseinc.com/blogs/education/pfas-forever-chemicals-cosmetics-makeup-explainer?_pos=1&_sid=6962ca83a&_ss=r (last visited Nov. 27, 2021).

are also denoted fluoroalkyl substances. PFAS and other fluorinated compounds are used in a variety of cosmetic products such as foundation, moisturizer, eyeshadow, powder, lipstick and shaving cream.

68.     As the study explained, cosmetics such as foundation and concealer are "'leave-on' products, *i.e.*, they are intended to stay on the skin all day, *with a consequently greater exposure expected compared to other product types that are intended to be washed off immediately after application* ('rinse-off' products)." [Emphasis added].

69.     The study further noted, "Dermal absorption is set conservatively at 70%. As mentioned earlier, the value is based on a study (Franko et al., 2012) which showed that approximately 25% PFOA (as acid) was absorbed through the skin and that 45% of the substance was retained in the epidermis."

70.     In a 2019 study, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS has adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[32]

71.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[33]

---

[32] *PFAS Explained*, *supra* note 17.
[33] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



72.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[34]

73.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[35]

74.     The danger of PFAS chemicals is well known. On September 20, 2020, a *New York Times* article titled "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies"

---

[34] *Id.*
[35] *What are the health effects of PFAS?*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, https://www.atsdr.cdc.gov/pfas/health-effects/index.html (last visited Nov. 27, 2021).

reported on the dangers of PFAS—particularly during gestation and in early childhood development:[36]

> Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.
>
> More disturbing, PFAS can also alter levels of both mothers' and babies' thyroid hormones, which oversee brain development, growth and metabolism, and also play a role in immunity. Prenatal PFAS exposures that disrupt metabolism and immunity may cause immediate and lasting effects on both mother and child. Women exposed to PFAS during pregnancy have higher risks of gestational diabetes and pre-eclampsia, a type of high blood pressure. Their babies are more likely to undergo abnormal growth in utero, leading to low birth weight, and later face increased risk of childhood obesity and infections.

75.     Additionally, according to the EEA:

> Costs to society arising from PFAS exposure are high, with the annual health-related costs estimated to be EUR 52-84 billion across Europe in a recent study (Nordic Council of Ministers, 2019). The study notes that these costs are likely underestimated, as only a limited range of health effects (high cholesterol, decreased immune system and cancer) linked to exposure to a few specific PFAS were included in the estimates.

76.     This analysis has yet to be performed in the United States; however, there is no reason to believe the conclusions would differ.

77.     "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where no essential or safer alternatives exist; (2)

---

[36] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW YORK TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.

labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[37]

**bareMinerals' Representations**

78.     Defendant is well aware of consumer demand for personal care products that are free from ingredients suspected or known to cause harm to humans and the environment, which is why it has consistently marketed bareMinerals—beginning with its brand name—as a "clean" brand, even going so far as to claim it sells "MAKEUP SO PURE AND CLEAN YOU CAN SLEEP IN IT."[38]

79.     This message is carried through its in-store marketing, official website and online marketing campaign, including its verified bareMinerals YouTube channel. The bareMinerals website reinforces its "clean" messaging with a substantial portion of the content dedicated to touting its success as a clean brand and a pioneer in the clean beauty industry.[39] The online marketing is directly demonstrative of the reasonable consumer's expectation when purchasing bareMinerals—a well-calculated result of its pervasive marketing as a "clean" brand. It is then no surprise that the reasonable consumer expects the bareMinerals products to be free from potentially harmful ingredients, such as PFAS, as bareMinerals reinforces that expectation through its pervasive, uniform marketing campaign.

80.     For example, bareMinerals expressly boasts that "[o]ur good-for-skin formulas are free of harsh chemicals and unnecessary additives, and full of botanical extracts and natural minerals that help improve skin's appearance."[40]

---

[37] *The Madrid Statement*, GREEN SCIENCE POLICY INSTITUTE, https://greensciencepolicy.org/our-work/science-policy/madrid-statement/ (last visited Nov. 27, 2021).
[38] *About bareMinerals*, *supra* note 2.
[39] *See id.*
[40] *Clean Beauty Makeup*, *supra* note 11.

81. Furthermore, bareMinerals markets the purchase of clean cosmetics as an opportunity for consumers to "do good" and "make a difference" in the world at large, claiming:

> We believe every little choice has the power to make a big difference — for ourselves, our communities, and the world around us. As creators of clean, cruelty-free products, we support initiatives that create a chain of good — empowering people to look good, feel good and do good for others. We want to help everyone feel THE POWER OF GOOD.[41]

82. Celebrity "Clean Beauty Ambassador," Hailey Bieber, is likewise prominently featured on the bareMinerals About Us page, being quoted as saying, "There's a lot of power in the choices we make every day, from how we treat people to the products we use."[42]

83. On its blog, titled "What Editors Are Saying About Clean Beauty," Defendant refers to the bareMinerals brand as household name, calling it "a beauty bag staple for millions of women across America."[43] The blog post also includes several quotes from beauty editors which only confirm the success of Defendant's marketing campaign in convincing reasonable consumers that the Products are clean and natural, and that the bareMinerals brand is transparent about its ingredients:[44]

> It's no secret that we were an early player in the clean beauty movement. With the 1995 launch of our now cult-favorite loose foundation, bareMinerals became a beauty bag staple for millions of women across the country. At the time, it was a revolutionary concept: makeup made from only five minerals that actually improved your skin over time. As the has brand evolved, our range of offerings of course increased, but our core tenants have never wavered: good-for-skin formulas and incredible payoff.[45]

***

> "An easy way to avoid reading the fine print of every label in your medicine cabinet is to simply choose brands that are committed to quality ingredients. Take

---

[41] *Id.*
[42] *Our Purpose*, *supra* note 4.
[43] Genevieve Ernst, *What Editors Are Saying About Clean Beauty*, BAREMINERALS (Jan. 22, 2019) https://www.bareminerals.com/blog/what-editors-are-saying-about-clean-beauty.html.
[44] *Id.*
[45] *Id.*

bareMinerals, for instance. Its hero product, the ORIGINAL Loose <u>Powder Foundation</u> SPF 15, has only five clean mineral ingredients. And the entire line is also non-toxic, cruelty-free, and totally clean without compromise."[46]

-Lexi Novak, *Bustle*

***

"Lately, I've been switching out a lot my <u>skin care products</u> with ones that are cleaner and more natural. I feel like if there are options that are just as effective and gentle that don't contain certain red-flag ingredients, why not use them? It seems like a smart investment in my skin long-term."[47]

-Lexi, Digital Content Director, as quoted in *The Zoe Report*

***

"Choosing a beauty brand that's transparent about their ingredients and that has a commitment to being full of what's beneficial and free of what's potentially harmful will set you on your way to creating a safe space for your face."

-Erin Kelly, Bustle

84.     Under its "Purpose" page, bareMinerals continues to tout its long history of selling clean products, including that its products are "CLEAN WITHOUT COMPROMISING PERFORMANCE:"

Long before clean beauty became part of the collective consciousness, we were making clean, natural mineral makeup and skincare. Purity in formulation and uncompromising performance have been our guiding principles since we launched in 1995. Very bareMinerals product is 100% free of parabens, phthalates, formaldehyde, chemical sunscreens, triclosan, triclocarban, propylene glycol, mineral oil, coal tar and microbeads, and we are ALWAYS cruelty-free. Skin-improving formulas with proven performance- that's CLEAN WITHOUT COMPROMISE."[48]

85.     Based upon bareMinerals' uniform, pervasive marketing messaging that its product line is "clean" and "natural," consumers purchase bareMinerals' Products expecting they will

---

[46] *Id.*
[47] *Id.*
[48] *Clean Beauty Makeup*, *supra* note 11.

receive just that—a product free from potentially harmful chemicals. bareMinerals reinforces that message with, among others, the following representations:[49]

    a.   "Good-for-skin, 24-hour, lightweight, full coverage liquid foundation with a natural matte finish."

    b.   "GOOD-FOR-SKIN INGREDIENTS."

    c.   "The luxuriously creamy liquid contains bamboo stem extract for a naturally matte, soft focus finish, while papaya enzymes gently improve skin's texture both immediately and over time. With good-for-skin ingredients that won't clog pores, barePRO® Performance Wear Liquid Foundation is Makeup So Pure And Clean You Can Sleep in It™."

    d.   "We're redefining performance wear with this new liquid mineral foundation that cares while it covers, improving the appearance of skin texture over time* while blurring pores and imperfections. The 24-hour breathable full coverage is powered by Mineral Lock™ Long-Wear Technology that blends mineral pigments with lipids naturally found in skin to lock in transfer-resistant, color-true coverage in 35 carefully calibrated shades."

86.    The obvious implication of these representations is to convince the consumer that bareMinerals is thoughtful and intentional about not including ingredients in its products that are harmful to humans and the environment.

87.    However, contrary to the bareMinerals name, business model and purpose, representations, and consumer expectation of clean products, it sells its Products, which contain PFAS chemicals that are known to be potentially harmful to humans and the environment.

88.    Reasonable consumers would consider PFAS a harmful chemical and would not expect it would be in the Products, as evidenced by Defendant's uniform, pervasive marketing campaign aimed at convincing consumers that the Products are clean and natural and do not contain any potentially harmful chemicals.

---

[49] *barePRO Liquid Foundation*, BAREMINERALS, https://www.bareminerals.com; follow "MAKEUP;" select "FOUNDATION;" then select "barePRO® Performance Wear Liquid Foundation SPF 20" (last visited Nov. 27, 2021).

89.     Plaintiffs' claims are economic in nature: Plaintiffs and the Classes were injured economically when they purchased the PFAS Makeup.

90.     As alleged herein, Plaintiffs and the Classes received something worth less than what they paid for and did not receive the benefit of their bargain. They paid for the PFAS Makeup, which was supposed to be clean and natural, but they received neither.

91.     No reasonable consumer would have purchased, or paid as much, for the PFAS Makeup had they known products contained harmful ingredients linked to adverse health effects in humans. Even more egregious, Defendant knew that the Products were manufactured with PFAS, but chose not to disclose this material information to their consumers in an effort to persuade them they were, in fact, buying clean and natural products, rather than products containing potentially harmful chemicals. Instead, they threw consumers off of the scent by representing that the Products are clean and/or natural.

92.     No reasonable consumer would expect that a product line marketed as free from harmful chemicals would contain an ingredient like PFAS—which scientific studies indisputably link to harmful health effects in humans. Accordingly, Plaintiffs and class members suffered economic injuries as a result of purchasing the PFAS makeup.

**PFAS Renders the PFAS Makeup Adulterated, Misbranded and Illegal to Sell**

93.     Plaintiffs bring claims under various state consumer and warranty theories and are not seeking to enforce any federal statute or regulation; however, much of the conduct giving rise to Plaintiffs' claims is likewise in violation of the Federal Food, Drug, and Cosmetics Act, 21 U.S.C. § 301, et seq. ("FDCA") and its implementing regulations.

94.     The Federal Food, Drug & Cosmetic Act ("FFDCA") establishes numerous regulations regarding the safety of cosmetics and drugs which are sold to consumers, including by creating various labeling requirements.

95.     The FFDCA prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, or cosmetic that is adulterated or misbranded." 21 U.S.C. § 331(a).

96.     Drugs and cosmetics that are "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Accordingly, adulterated and misbranded products have no economic value and are legally worthless.

97.     The PFAS Makeup is a cosmetic which is regulated by the U.S. Food and Drug Administration ("FDA"). *See* 21 U.S.C. § 321(i).

98.     The PFAS Makeup containing sunscreen is classified by the FDA as *both* a "cosmetic" and a "drug." *See* 21 C.F.R. 700.35.

99.     California's Sherman Food, Drug, and Cosmetic Law has expressly adopted the federal labeling requirements as its own. The definition of "adulterated" as defined by Cal. Health & Safety Code § 111265 mirrors the FDA definition, defining an adulterated drug as one that is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health."[50]

100.     In fact, under the California law, drugs and cosmetics are required to satisfy all of the labeling requirements of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301, *et seq.*), and the federal Fair Packaging and Labeling Act (15 U.S.C. §§ 1451, et seq.).[51] It is unlawful in the state of California to distribute drugs if the packaging or labeling does not conform to the

---

[50] *See* Cal. Health & Safety Code § 111265.
[51] *See* Cal. Health & Safety Code § 110371.

provisions of California and/or Federal law.[52] Further, it is unlawful for any person to disseminate any false advertisement of any food, drug, device, or cosmetic. An advertisement is false if it is false or misleading in any particular.[53] It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.[54]

101.    Likewise, New Jersey, North Carolina, and Ohio have expressly adopted the federal labeling requirements as their own. *See* N.J.S.A § 24:5-18.1; Cal. Health & Safety Code § 111730; Ohio Food and Drug Safety Act, R.C. 3715.52(A); North Carolina Pure Food, Drug and Cosmetic Act, N.C.G.S.A. §§ 106-136.

### The PFAS Makeup is a Misbranded and Adulterated Drug

102.    Many of the PFAS Makeup products contain sunscreen, including the BAREPRO® Performance Wear Liquid Foundation SPF 20 and Original Liquid Mineral Foundation Broad Spectrum SPF 20, which makes them "drugs" subject to applicable FFDCA regulations.

103.    The PFAS Makeup with sunscreen constitutes a misbranded drug, adulterated drug, and/or unapproved new drug that does not meet the general requirements for over-the-counter drugs to be marketed without an approved application. The manufacture of any misbranded or adulterated drug is prohibited under federal law. 21 U.S.C. § 331(g).

104.    The introduction or delivery for introduction into interstate commerce (or receipt thereof) of any misbranded or adulterated drug is prohibited under federal law. 21 U.S.C. § 331(a), (c).

---

[52] Cal. Health & Safety Code § 110385.
[53] Cal. Health & Safety Code § 110390.
[54] Cal. Health & Safety Code § 110398.

105.     Further, the introduction or delivery for introduction into interstate commerce of a purported nonprescription OTC drug that fails to meet the OTC drug requirements is prohibited under federal law. 21 U.S.C §§ 355(a) and 331(d).

106.     The PFAS Makeup containing sunscreen is a misbranded drug under 21 U.S.C. § 352 and the relevant regulations.

107.     It is similarly misbranded under the applicable regulations, which state, in part, that an OTC drug "is generally recognized as safe and effective and is not misbranded if it meets each of the conditions contained in [21 C.F.R. §§ 330.1 – 330.15] and each of the conditions contained in any applicable monograph." 21 C.F.R. § 330.1. The general regulations also incorporate the statutory language, providing that a drug is misbranded where it is not "labeled in compliance with chapter V of the Federal Food, Drug, and Cosmetic Act[.]" 21 C.F.R. § 330.1(c)(1).

108.     21 U.S.C. § 352(a)(1) provides that a drug shall be deemed to be misbranded under the FFDCA if, inter alia, if "its labeling is false or misleading in any particular."

109.     Further, "[i]f an article is alleged to be misbranded because the labeling...is misleading, then in determining whether the labeling...is misleading there shall be taken into account (among other things) not only representations made or suggested by statement [or] word,...but also the extent to which the labeling...fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article...under such conditions of use as are customary or usual." 21 U.S.C. § 321(n).

110.     Here, Defendant has violated 21 U.S.C. § 352(a)(1) rendering the PFAS Makeup "misbranded."

111.    The PFAS Makeup's labeling (in the ingredients list or otherwise) fails to reveal that it contains or may contain PFAS. The absence of this disclosure conveys that it is not possible that PFAS may be in the PFAS Makeup, which Plaintiffs' independent third-party testing demonstrates is false, and which is contradicted by the PFAS Makeup Study, which confirms that at least one ingredient in each of the PFAS Makeup products is known to be (or is likely to be) a source of PFAS.

112.    The omission that the PFAS Makeup contains or may contain a dangerous chemical is a material fact for any consumer item, and especially so for a product that is purchased for the purposes of promoting skin health and preventing sun damage.

113.    Exposure or potential exposure to PFAS is even more material given that other products which offer the same sun protection are free of PFAS and other synthetic chemicals known to be harmful to humans.

114.    21 U.S.C. § 352(e)(1)(A)(iii) provides that a drug is also misbranded under the FFDCA "[i]f it is a drug, unless its label bears, *inter alia*, the established name of each inactive ingredient listed in alphabetical order on the outside container of the retail package." The regulations incorporate the same, mandating disclosure of "[t]he ingredient information required by [21 USC § 352(e)]" of the FFDCA. 21 C.F.R. § 201.10(a).[55]

115.    The regulations similarly provide, as part of the label's content requirements, that the label discloses the "'inactive ingredients' followed by a listing of the established name of each inactive ingredient." 21 C.F.R. § 201.66(c)(8).

---

[55] The FFDCA requires a label to list, *inter alia*, "the established name and quantity of...each active ingredient" as well as "the established name of each inactive ingredient[.]" 21 U.S.C. § 352(e)(ii), (iii).

116.    Part 201 (which governs labeling) defines "active ingredient" as "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans." 21 C.F.R. § 201.66(b)(2). "Inactive ingredient means any component other than an active ingredient." 21 C.F.R. § 201.66(b)(8).

117.    While 'component' as it is used in Part 201 is not defined, Part 201 specifies that with respect to a finished product's label ingredient list, "[t]he term ingredient applies to any substance in the drug[.]" 21 C.F.R. § 201.10(b). Thus, OTC drugs as they are delivered to consumers may only contain "active ingredients" or "inactive ingredients."

118.    Further, a substance that is present in some, but not all, bottles of a drug product should still be listed as an "inactive ingredient" if a manufacturer were to, as here, use a uniform ingredients list.

119.    In its OTC Labeling Guidance, when discussing 21 C.F.R. § 201.66(c)(8)'s "inactive ingredient" requirement, FDA explains:

> There may be circumstances when manufacturers, packers, and distributors who market OTC drug products use multiple suppliers for some drug products to maintain an uninterrupted supply of the drug product to their customers. In such cases, the specific inactive ingredients in the drug products may vary slightly from supplier to supplier: some inactive ingredients may be present in drug products coming from all suppliers while other inactive ingredients may not be present. To have one label for all drug products, we recommend that the ingredients that may (or may not) be contained in each individual drug product be listed on the labeling in the following manner.

> We believe that this type of inactive ingredient labeling can be accomplished best by placing those ingredients that may (or may not) be contained in an OTC drug product in the inactive ingredient listing, as set forth in § 201.66(c)(8), with an asterisk placed next to those ingredients (e.g., acacia*, dextrose*, sucrose, xanthum gum*). The asterisk would then be reprinted at the bottom or end of the inactive ingredient section in the Drug Facts box with the notation "* contains one or more of these ingredients" (if more than one ingredient may (or may not) be in the drug

product), or "* may contain this ingredient" (if only one ingredient may (or may not) be in the drug product), whichever is appropriate.

....

Manufacturers, packers, and distributors are also reminded to follow all applicable current good manufacturing practice regulations in 21 CFR part 211 for finished pharmaceuticals so that manufacturers maintain appropriate records showing which lot numbers of the drug product contain which inactive ingredients.

FDA, Guidance for Industry: Labeling OTC Human Drug Products (May 2009) at 9, 12- 13, avail.

at https://www.fda.gov/media/76481/download.

120.    Thus, had Defendant followed FDA's guidance, it would have at least included PFAS in the inactive ingredients list with a "may contain this ingredient" asterisk. Since Defendant chose to use uniform ingredient labeling in all lots of the PFAS Makeup, it was required to make this disclosure, which it failed to do.

121.    Here, Defendant has violated 21 U.S.C. § 352(e) and/or related regulations, rendering the Products "misbranded."

122.    Alternatively, even if PFAS was not required to be listed as an ingredient, 21 U.S.C. § 352(j) provides that a drug is also misbranded under the FFDCA if "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."

123.    Here, Defendant has violated 21 U.S.C. § 352(j), rendering the PFAS Makeup which contains sunscreen "misbranded."

124.    As described herein, cosmetics such as the PFAS Makeup are meant to be applied to the skin and worn for the course of many hours. In fact, some of the PFAS Makeup products are designed to be worn for as many as 24 hours.[56]

125.    Further, recent studies have shown that PFAS is absorbed by the skin, and the PFAS Makeup increases consumer exposure when it is used as directed and applied to the skin.

126.    Given that the PFAS Makeup designed to be used daily on the skin to help provide sun protection in addition to any cosmetic benefit, and given that PFAS-free makeup products exist offering the same therapeutic benefit, utilizing a makeup with sunscreen that contains PFAS creates a completely avoidable and unreasonable risk.

127.    In addition to (or in the alternative to) being "misbranded" under 21 U.S.C. § 352, the PFAS Makeup is "adulterated" under 21 U.S.C. § 351 and related regulations.

128.    As OTC drug products regulated by the FDA, the PFAS Makeup must be both safe and effective and is subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FFDCA's state law analogues. These cGMP regulations require OTC medications like the PFAS Makeup to meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).

129.    The cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." 21 C.F.R. § 210.1(a). In other words, manufacturers, like

---

[56] *BAREPRO® Performance Wear Liquid Foundation Broad Spectrum 20 SPF*, BAREMINERALS, https://www.bareminerals.com/products/barepro-performance-wear-liquid-foundation-spf-20?variant=40493848297557 (last visited Apr. 11, 2023).

Defendant, at all phases of the design, manufacture, and distribution chain are bound by these requirements.

130.     The cGMPs set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K). The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

131.     Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" and may not be distributed or sold in the United States. *See* 21 U.S.C. §§ 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

132.     FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

133.     A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

134.     "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established

standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6).

135.    The mere presence of PFAS—which, upon information and belief, resulted from Defendant's failure to comply with cGMPs—renders the PFAS Makeup adulterated and under the FDCA. The Products are adulterated because they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(1).

136.    As a seller of an OTC drug product, Defendant had and has a duty to ensure that its Products did not and do not contain PFAS, including through regular testing, especially before injecting the PFAS Makeup into the stream of commerce for consumers to use on their bodies. But based on Plaintiffs' independent testing results set forth above, Defendant made no reasonable effort to test its PFAS Makeup for PFAS or other impurities. Nor did it disclose to Plaintiffs in any advertising or marketing that the PFAS Makeup contained or risked containing PFAS. To the contrary, Defendant represented and warranted, expressly and impliedly, that the PFAS Makeup was of merchantable quality, complied with federal and state law, and did not contain ingredients such as PFAS.

137.    The PFAS Makeup is also a misbranded drug because its labeling is "false" and "misleading" because it does not disclose the presence of PFAS. 21 U.S.C. § 352(a)(1).

138.    Further, the PFAS Makeup's labeling is false and misleading insofar as it purports to be clean by its use of the brand name "bareMinerals."

32

139.    The omission that the PFAS Makeup may contain a toxic chemical is a material fact for any consumer item, and especially so for a product that is designed to be used as part of a daily beauty regimen.

### The PFAS Makeup is a Misbranded and Adulterated Cosmetic

140.    In addition to being a misbranded and adulterated drug, the PFAS Makeup is also a misbranded and adulterated cosmetic.

141.    Under the FDCA, a cosmetic is deemed "adulterated" if it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under such conditions of use as are customary or usual. *See* 21 U.S.C. § 361(a).

142.    Under the FDCA, a cosmetic is deemed "misbranded" if its labeling is false or misleading in any particular. *See* 21 U.S.C. § 362(a).

143.    Cosmetics are also considered "misbranded" if FDCA labeling requirements are not prominently displayed on the product's packaging. *See* 21 U.S.C. § 362(c). The label of a cosmetic must contain a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product. 21 C.F.R. § 740.1

144.    As detailed herein, PFAS is indisputably linked to negative health consequences and is therefore a "poisonous or deleterious substance." The presence of PFAS renders the PFAS Makeup adulterated.

145.    Likewise, the PFAS Makeup is misbranded because its labeling is false and misleading insofar as it purports to be clean by its use of the brand name "bareMinerals."

146.    The PFAS Makeup is further misbranded because its labeling is false and misleading insofar as it fails to disclose the PFAS Makeup contains or may contain PFAS.

147.    The omission that the PFAS Makeup may contain a toxic chemical is a material fact for any consumer item, and especially so for a product that is designed to be used as part of a daily beauty regimen.

148.    Cosmetics that are adulterated or misbranded may not be manufactured, distributed or sold in the United States. *See* 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

149.    Applicable state statutes governing cosmetic labeling are either identical or substantially similar to the requirements under the FDCA. *See* N.J.S.A § 24:5-18.1; Cal. Health & Safety Code § 111730; Ohio Food and Drug Safety Act, R.C. 3715.52(A); North Carolina Pure Food, Drug and Cosmetic Act, N.C.G.S.A. §§ 106-136, 106-137.

150.    As a seller of cosmetics, Defendant had and has a duty to ensure that the PFAS Makeup did not and does not contain toxic ingredients such as PFAS, including through regular testing, before the PFAS Makeup is injected into the stream of commerce for consumers to purchase and use.

151.    Based on Plaintiffs' independent testing results set forth above, which corroborated the results of the Notre Dame PFAS Makeup Study identifying ingredients most often treated with PFAS, Defendant made no reasonable effort to test the PFAS Makeup for PFAS, despite representing to the public that it maintained comprehensive safety and quality control measures. Nor did it disclose to Plaintiffs in any advertising, marketing or labeling that the PFAS Makeup contained PFAS. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Product was "bare" and clean, that it was of merchantable quality, complied with federal and state law, and did not contain dangerous substances such as PFAS.

**Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiffs and Reasonable Consumers**

152.     Defendant is well aware of consumers' desire to avoid potentially harmful chemicals, which is exactly why they have engaged in an aggressive, uniform marketing campaign intended to convince consumers that the PFAS Makeup is free from harmful artificial ingredients like PFAS.

153.      In its own words, "Shiseido responds to the increasing number of consumers that put social responsibility and environmental impact at the top of their purchasing decisions by promoting brands that focus on sustainability such as *bareMinerals*."[57] Accordingly, bareMinerals is positioned as Defendant's flagship clean and "bare" brand.[58]

154.     Defendant has affirmed its commitment to developing and offering products that are safe and meet high quality standards and claims to promote the health of the human body as well as the environment in developing its products.[59]

155.     Defendant claims that safety remains their top priority by complying with its own stringent safety standards, including by "rigorously test[ing] each ingredient including impurities before incorporating it into our final product to ensure that the final product is completely safe for use."[60]

156.     Defendant touts its careful selection of ingredients, going so far as to recognize the fact that "even minute amounts of impurities may result in major differences in safety and quality."[61] Defendant even maintains a policy regarding its ingredient selection, which includes

---

[57] https://corp.shiseido.com/en/sustainability/pdf/2019.pdf (last visited Apr. 14, 2023).
[58] *Id*.
[59] *Id*.
[60] https://corp.shiseido.com/en/rd/safety/ (last visited Apr. 14, 2023).
[61] https://corp.shiseido.com/en/rd/safety/material.html (last visited Apr. 14, 2023).

processes to purify any ingredients (including those derived from natural sources) which may be suspected of containing impurities.[62]

157.    Furthermore, as one of the leading cosmetic production companies in the world, Defendant knew or should have known that many ingredients used in the PFAS Makeup are at risk of containing PFAS, as further detailed herein.

158.    Defendant has also represented to consumers that it specifically reviews the PFAS Makeup for PFAS, stating: "All of our products undergo rigorous quality, health, and safety assessments, including ingredient review, and we are confident they are safe for use. We do not use PFAS as an ingredient in any of our products."[63]

159.    Accordingly, at all times relevant to this action, Defendants knew, or at minimum should have known, that the PFAS Makeup contains PFAS.

160.    At minimum, Defendant should have discovered the presence of PFAS in the course of its manufacturing process based on both the cGMP and Defendant's purported commitment to the safety and quality of the ingredients used in the PFAS Makeup as alleged herein.

161.    Defendant has engaged in deceptive, untrue, and misleading advertising by making representations regarding the safety and purity of the Product, assuring consumers that it adheres to strict protocols to ensure that ingredients are of the highest quality and free of any incidental contamination.

162.    Defendant made all of these assurances regarding the safety and quality of its PFAS Makeup without disclosing to consumers that the PFAS Makeup contains PFAS chemicals.

---

[62] *Id.*
[63] *BAREPRO® Performance Wear Liquid Foundation Broad Spectrum 20 SPF*, BAREMINERALS, https://www.bareminerals.com/makeup/face/foundation/barepro®-24hr-performance-wear-liquid-foundation-broad-spectrum-spf-20/US83542.html#tab-ingredients (last visited Mar. 31, 2023).

163.    Additionally, although the PFAS Makeup was found to contain PFAS, Defendant does not list PFAS among the active ingredients anywhere on its website, and nothing on the PFAS Makeup's labels otherwise insinuates, states, or warns that the PFAS Makeup contains PFAS. Again, such misrepresentations mislead consumers regarding the safety and quality of the Product.

164.    Rather, to capitalize on increasing consumer demand for "clean" beauty products which are free from artificial ingredients, including harmful man-made chemicals like PFAS, Defendant has knowingly and willfully deployed a concerted strategy to distinguish its PFAS Makeup from competing options in the highly competitive personal care industry by representing the PFAS Makeup as a "clean" brand without artificial or synthetic ingredients.

165.    Throughout the class period, Defendant has targeted health-conscious consumers by falsely and misleadingly representing the PFAS Makeup is "clean." Consequently, reasonable consumers believe the PFAS Makeup is free of artificial, man-made chemicals which are known or suspected to harm human health.

166.    Defendant's strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell cosmetics which only contain natural and "clean" ingredients, would inevitably be negatively impacted if it disclosed the presence of PFAS in its Product.

167.    Consumers lack the expertise to ascertain the true ingredients in the PFAS Makeup prior to purchase. Accordingly, reasonable consumers must, and do rely on Defendant to accurately and honestly advertise its products' ingredients and not contradict those representations by using artificial man-made chemicals in the PFAS Makeup that are known to pose a risk to human health. Such misrepresentations are material to reasonable consumers' purchasing decisions.

168.    Defendant's representations that the PFAS Makeup is a natural, clean cosmetic product, including, *inter alia*, the representations described herein, are false because products containing toxic, man-made ingredients like PFAS are not "natural" by definition.

169.    Consumers reasonably relied on Defendant's false statements and misleading representations, and reasonably expected that Defendant's PFAS Makeup would conform with its representations and, as such, would not contain artificial, man-made PFAS chemicals.

170.    Defendant's false statements, misleading representations and material omissions are intentional, or otherwise entirely careless. The presence of PFAS in the PFAS Makeup renders it misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce.

171.    If Defendant had disclosed to Plaintiffs and putative Class Members that its PFAS Makeup contained PFAS chemicals and was therefore not "clean" or natural, Plaintiffs and putative Class Members would not have purchased the PFAS Makeup or they would have paid less for it.

172.    Plaintiffs and Class Members were among the intended recipients of Defendant's deceptive representations and omissions described herein.

173.    Defendant's representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

174.    The materiality of the representations described herein also establishes causation between Defendant's conduct and the injuries Plaintiffs and the Class Members sustained.

175.    Defendant is aware that the consumers are concerned about the use of PFAS in its products, yet it has continued to market and advertise its PFAS Makeup using "natural"

representations in order to profit off of unsuspecting consumers, including Plaintiffs and Class Members.

176.    The presence of PFAS chemicals in the PFAS Makeup is entirely inconsistent with its uniform representations.

177.    If Defendant had not routinely disregarded the FDA's cGMPs, or had fulfilled their quality assurance obligations, Defendant would have identified the presence of PFAS through routine and required testing.

178.    Further, if Defendant had adequately tested the PFAS Makeup for PFAS and other carcinogens and impurities as it claims, it would have discovered that the PFAS Makeup contains PFAS.

179.    Defendant's knowingly false and misleading representations have the intended result of convincing reasonable consumers that its PFAS Makeup is without artificial, unnatural, or otherwise synthetic ingredients and therefore does not contain man-made, toxic chemicals. No reasonable consumer would consider Defendant's PFAS Makeup a natural or "clean" cosmetic if they knew that it contained harmful, artificial PFAS chemicals.

180.    Defendant's false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiffs and Class Members.

181.    In making the false, misleading, and deceptive representations, Defendant knew and intended consumers would pay a premium for the PFAS Makeup over comparable products that are made from or contain synthetic or artificial ingredients.

182.    When Plaintiffs purchased the PFAS Makeup, Plaintiffs did not know, and had no reasonable means of discovering, that it contained or risked containing harmful PFAS chemicals.

183.    Plaintiffs and Class Members all paid money for the PFAS Makeup, however, they did not obtain the full value of the advertised Product due to Defendant's misrepresentations and omissions as detailed herein. Plaintiffs and Class Members purchased, purchased more of, or paid more for, the PFAS Makeup than they would have had they known the truth that it contains artificial, man-made, and harmful chemicals. Thus, Plaintiffs and Class Members have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

184.    If Defendant had disclosed to Plaintiffs and putative Class Members that the PFAS Makeup contained or risked containing PFAS and thus risked consumer exposure to PFAS, Plaintiffs and putative Class Members would not have purchased the PFAS Makeup or they would have paid less for it.

185.    Defendant's widespread marketing campaign portraying the PFAS Makeup as "clean" and natural as detailed herein is misleading and deceptive to consumers because the PFAS Makeup contains artificial, man-made, and toxic PFAS chemicals.

186.    Accordingly, Plaintiffs bring this action on behalf of the proposed Classes to stop Defendant's misleading practices.

**TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

187.    Defendant has had actual knowledge for years that the PFAS Makeup contained potentially harmful chemicals such as PFAS.

188.    Although Defendant was aware of the deception in its labeling given the inclusion of PFAS in its Products, it took no steps to warn  Plaintiffs or Class Members of such PFAS.

189.    Despite its knowledge, Defendant has fraudulently concealed the fact that Products contain PFAS. Defendant had a duty to disclose the existence of the PFAS.

190.    Defendant made, and continues to make, affirmative misrepresentations to consumers, to promote sales of the PFAS Makeup, including that the PFAS Makeup is clean, natural, and suitable for even the most sensitive skin.

191.    Defendant concealed material facts that would have been important to Plaintiffs and Class Members in deciding whether to purchase the PFAS Makeup.  Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiffs and Class Members. Accordingly, Plaintiffs and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered  injury as a proximate result of that justifiable reliance.

192.    The PFAS in the formulation, design and/or manufacture of the PFAS Makeup was not reasonably detectible to Plaintiffs and Class Members.

193.    At all times, Defendant actively and intentionally concealed the existence of the PFAS and failed to  inform Plaintiffs or Class Members of the existence of the PFAS. Accordingly, Plaintiffs and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

194.    Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the PFAS Makeup contained harmful chemicals.

195.    Defendant concealed the PFAS for the purpose of delaying Plaintiffs and Class Members from filing a complaint on their causes of action.

196.    As a result of Defendant's active concealment of the PFAS and/or failure to inform Plaintiffs and Class Members of the PFAS, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled. Furthermore, Defendant is estopped from

relying on any statutes of limitations in light of its active concealment of the potentially harmful and/or human-made nature of the PFAS Makeup.

197.    Further, the causes of action alleged herein did not occur until Plaintiffs and Class Members discovered that the Products contained PFAS. Plaintiffs and Class Members had no realistic ability to discern that the Products contained PFAS until they learned of the existence of the PFAS. In either event, Plaintiffs and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence and true nature of the PFAS.

## FED. R. CIV. P. 9(b) ALLEGATIONS
### (Affirmative and By Omission)

198.    Although Defendant is in the best position to know what content it placed on its website(s) and in marketing materials during the relevant timeframe, and the knowledge that it had regarding the PFAS and its failure to disclose the existence of PFAS in the Products to consumers, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

199.    **WHO**: Defendant made material misrepresentations and/or omissions of fact through the brand name itself "bareMinerals," its labeling, website representations, third-party retailers, and marketing statements, which include the statements that the PFAS Makeup was clean and natural, which omitted material information regarding harmful chemicals in the PFAS Makeup.

200.    **WHAT**: Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the PFAS Makeup contains PFAS, an ingredient that Defendant knew would not be deemed clean or natural by Plaintiffs and Class Members. Thus, Defendant's conduct deceived Plaintiffs and Class Members into believing that the PFAS Makeup is clean and natural.

Defendant knew or should have known this information is material to reasonable consumers, including Plaintiffs and Class Members in making their purchasing decisions, yet it continued to pervasively market its PFAS Makeup as clean and natural.

201.   **WHEN**: Defendant made material misrepresentations and/or omissions during the putative Class periods and at the time Plaintiffs and Class Members purchased the PFAS Makeup, prior to and at the time Plaintiffs and Class Members made claims after realizing the PFAS Makeup contained harmful chemicals, and continuously throughout the applicable Class periods.

202.   **WHERE**: Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of its packaging, its website(s), through marketing materials.

203.   **HOW**: Defendant made material misrepresentations and/or failed to disclose material facts regarding the PFAS Makeup, including but not limited to the presence of PFAS.

204.   **WHY**: Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiffs, Class Members, and all reasonable consumers to purchase and/or pay for the PFAS Makeup, the effect of which was that Defendant profited by selling the PFAS Makeup to many thousands of consumers.

205.   **INJURY**: Plaintiffs and Class Members purchased, paid a premium, or otherwise paid more for the PFAS Makeup when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

**PLAINTIFF'S FACTUAL ALLEGATIONS**

**Plaintiff Onaka's Experience**

206.   Plaintiff Daian Onaka purchased the PFAS Makeup, including BAREPRO® Performance Wear Liquid Foundation SPF 20, BAREPRO® 16-Hr Full Coverage Concealer,

Original Liquid Mineral Foundation, GEN NUDE® Matte Liquid Lipstick. She purchased the PFAS Makeup most recently in September 2021, at bare+Beauty, a bareMinerals outlet store located in Livermore, California.

207.    Each PFAS Makeup product that Plaintiff purchased was tested in either September or October 2021, as described above, in close proximate time to when Plaintiffs conducted testing on the PFAS Makeup Products.

208.    Based on information and belief, the ingredients listed on the tested PFAS Makeup product labels did not change in between the time that Plaintiff purchased the PFAS Makeup and the date the PFAS Makeup products were tested. As described herein, at least one, if not more, of the ingredients contained in Plaintiff's PFAS Makeup is known to be a source of undisclosed PFAS in cosmetic products.

209.    Plaintiff Onaka was familiar with bareMinerals, and had previously purchased bareMinerals products, including the PFAS Makeup.

210.    Plaintiff Onaka purchased the PFAS Makeup based on her belief that the product was clean, natural, and free from harmful chemicals.

211.    Plaintiff Onaka was willing to pay the price she paid for the PFAS Makeup because she believed its purported "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

212.    Plaintiff Onaka was specifically drawn to the bareMinerals product line because of its brand name and clean marketing, which to Plaintiff Onaka, meant that the products would be free from harmful chemicals. Plaintiff Onaka looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendant disclose the presence of PFAS chemicals in the PFAS Makeup nor did Defendant disclose the product contains harmful chemicals.

213.    If Plaintiff Onaka had been aware of the presence of potentially harmful chemicals, like PFAS, in the PFAS Makeup, she would not have purchased the PFAS Makeup or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

214.    As a result of Defendant's action, Plaintiff Onaka has incurred damages, including economic damages.

215.    On November 2, 2021 prior to the filing of this Complaint, Plaintiff Onaka and Class Members put Defendant on written notice of her claims arising from violations of numerous provisions of California law, including the California Consumer Legal Remedies Act ("CLRA"), California Civil Code § 1770, *et seq*., as well as other causes of action. Defendant has not responded.

216.    On November 18, 2021, counsel for Defendant acknowledged receipt of the letter; however, Defendant failed to provide any substantive response or request additional time to do so.

**Plaintiff Torshia Woods' Experience**

217.    Plaintiff Torshia Woods purchased the PFAS Makeup, including BAREPRO® Performance Wear Liquid Foundation SPF 20 and Original Liquid Mineral Foundation. She purchased the PFAS Makeup most recently on October 15, 2021, directly from the bareMinerals website.

218.    Each PFAS Makeup product that Plaintiff purchased was tested in September or October 2021, as described above, in close proximate time to when Plaintiffs conducted testing on the PFAS Makeup Products.

219.    Based on information and belief, the ingredients listed on the PFAS Makeup product labels did not change in between the time that the PFAS Makeup products were tested and when Plaintiff purchased the PFAS Makeup. As described herein, at least one, if not more, of the

ingredients contained in Plaintiff's PFAS Makeup is known to be a source of undisclosed PFAS in cosmetic products.

220.    Plaintiff Woods was familiar with bareMinerals, and had previously purchased bareMinerals products, including the PFAS Makeup.

221.    Plaintiff Woods purchased the PFAS Makeup based on her belief that the product was clean, natural, and free from harmful chemicals.

222.    Plaintiff Woods was willing to pay the price she paid for the PFAS Makeup because she believed its purported "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

223.    Plaintiff Woods was specifically drawn to the bareMinerals product line because of its brand name and clean marketing, which to Plaintiff Woods, meant that the products would be free from harmful chemicals. Plaintiff Woods looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendant disclose the presence of PFAS chemicals in the PFAS Makeup nor did Defendant disclose the product contains harmful chemicals.

224.    If Plaintiff Woods had been aware of the presence of potentially harmful chemicals, like PFAS, in the PFAS Makeup, she would not have purchased the PFAS Makeup or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

225.    As a result of Defendant's action, Plaintiff Woods has incurred damages, including economic damages.

**Plaintiff Sheli Zeller's Experience**

226.    Plaintiff Zeller purchased the PFAS Makeup, including BAREPRO® Performance Wear Liquid Foundation SPF 20 and GEN NUDE® Matte Liquid Lipstick. She purchased the PFAS Makeup most recently on October 11, 2021 from Amazon.

227.    Each PFAS Makeup product that Plaintiff purchased was tested in September or October 2021, as described above, in close proximate time to when Plaintiffs conducted testing on the PFAS Makeup Products.

228.    Based on information and belief, the ingredients listed on the PFAS Makeup product labels did not change in between the time that the PFAS Makeup products were tested and when Plaintiff purchased the PFAS Makeup. As described herein, at least one, if not more, of the ingredients contained in Plaintiff's PFAS Makeup is known to be a source of undisclosed PFAS in cosmetic products.

229.    Plaintiff Zeller was familiar with bareMinerals, and had previously purchased bareMinerals products, including the PFAS Makeup.

230.    Plaintiff Zeller purchased the PFAS Makeup based on her belief that the product was clean, natural, and free from harmful chemicals.

231.    Plaintiff Zeller was willing to pay the price she paid for the PFAS Makeup because she believed its purported "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

232.    Plaintiff Zeller was specifically drawn to the bareMinerals product line because of its brand name and clean marketing, which to Plaintiff Zeller, meant that the products would be free from harmful chemicals. Plaintiff Zeller looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendant disclose the presence of PFAS chemicals in the PFAS Makeup nor did Defendant disclose the product contains harmful chemicals.

233.    If Plaintiff Zeller had been aware of the presence of PFAS chemicals in the PFAS Makeup, she would not have purchased the PFAS Makeup or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

234.    As a result of Defendant's action, Plaintiff Zeller has incurred damages, including economic damages.

**Plaintiff Margo Ferguson's Experience**

235.    Plaintiff Ferguson purchased the PFAS Makeup, including BAREPRO® Performance Wear Liquid Foundation SPF 20. She purchased the PFAS Makeup most recently on January 15, 2021 from the Ulta website.

236.    The PFAS Makeup product that Plaintiff purchased was tested in either September 2021, as described above, approximately eight months before Plaintiffs conducted testing on the PFAS Makeup products.

237.    Based on information and belief, the ingredients listed on the PFAS Makeup product labels did not change in between the time that the PFAS Makeup products were tested and when Plaintiff purchased the PFAS Makeup. As described herein, at least one, if not more, of the ingredients contained in Plaintiff's PFAS Makeup is known to be a source of undisclosed PFAS in cosmetic products.

238.    Plaintiff Ferguson was familiar with bareMinerals, and had previously purchased bareMinerals products, including the PFAS Makeup.

239.    Plaintiff Ferguson purchased the PFAS Makeup based on her belief that the product was clean, natural, and free from harmful chemicals.

240.    Plaintiff Ferguson was willing to pay the price she paid for the PFAS Makeup because she believed its purported "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

241.    Plaintiff Ferguson was specifically drawn to the bareMinerals product line because of its brand name and clean marketing, which to Plaintiff Ferguson, meant that the products would

be free from harmful chemicals. Plaintiff Ferguson looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendant disclose the presence of PFAS chemicals in the PFAS Makeup nor did Defendant disclose the product contains harmful chemicals.

242.    If Plaintiff Ferguson had been aware of the presence of PFAS chemicals in the PFAS Makeup, she would not have purchased the PFAS Makeup or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

243.    As a result of Defendant's action, Plaintiff Ferguson has incurred damages, including economic damages.

**Plaintiff Eva Bailey's Experience**

244.    Plaintiff Bailey purchased the PFAS Makeup, including BAREPRO® Performance Wear Liquid Foundation SPF 20. She purchased the PFAS Makeup most recently on March 4, 2021 from the bareMinerals website.

245.    The PFAS Makeup product that Plaintiff purchased was tested in either September 2021, as described above, approximately six months before Plaintiffs conducted testing on the PFAS Makeup products.

246.    Based on information and belief, the  ingredients listed on the PFAS Makeup product labels did not change in between the time that the PFAS Makeup products were tested and when Plaintiff purchased the PFAS Makeup. As described herein, at least one, if not more, of the ingredients contained in Plaintiff's PFAS Makeup is known to be a source of undisclosed PFAS in cosmetic products.

247.    Plaintiff Bailey was familiar with bareMinerals, and had previously purchased bareMinerals products, including the PFAS Makeup.

248.    Plaintiff Bailey purchased the PFAS Makeup based on her belief that the product was clean, natural, and free from harmful chemicals.

249.    Plaintiff Bailey was willing to pay the price she paid for the PFAS Makeup because she believed its purported "clean" formulation would not contain potentially harmful chemicals, such as PFAS.

250.    Plaintiff Bailey was specifically drawn to the bareMinerals product line because of its brand name and clean marketing, which to Plaintiff Bailey, meant that the products would be free from harmful chemicals. Plaintiff Bailey looked at the product's packaging prior to her purchase, but nowhere on the packaging did Defendant disclose the presence of PFAS chemicals in the PFAS Makeup nor did Defendant disclose the product contains harmful chemicals.

251.    If Plaintiff Bailey had been aware of the presence of PFAS chemicals in the PFAS Makeup, she would not have purchased the PFAS Makeup or would have paid significantly less. Therefore, she did not receive the benefit of her bargain.

252.    As a result of Defendant's action, Plaintiff Bailey has incurred damages, including economic damages.

## **CLASS ACTION ALLEGATIONS**

253.    Plaintiffs bring this action individually and as representatives of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Nationwide Class:

> **During the fullest period allowed by law, all persons residing in the United States who purchased the PFAS Makeup.**

254.    Plaintiff Onaka brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following California Class:

> **During the fullest period allowed by law, all persons residing in the State of California who purchased the PFAS Makeup.**

255.   Plaintiff Woods brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Mississippi Class:

> **During the fullest period allowed by law, all persons residing in the State of Mississippi who purchased the PFAS Makeup.**

256.   Plaintiff Zeller brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Ohio Class:

> **During the fullest period allowed by law, all persons residing in the State of Ohio who purchased the PFAS Makeup.**

257.   Plaintiff Ferguson brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following New Jersey Class:

> **During the fullest period allowed by law, all persons residing in the State of New Jersey who purchased the PFAS Makeup.**

258.   Plaintiff Bailey brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following North Carolina Class:

> **During the fullest period allowed by law, all persons residing in the State of North Carolina who purchased the PFAS Makeup.**

259.   Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

260.     Plaintiffs reserve the right to modify the class definitions, if necessary, to include additional products with the same PFAS and/or other makeup products manufactured by Defendant with PFAS but bearing different brand names.

261.     **Numerosity**: Class Members are so numerous that joinder of all Members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of tens of thousands of people geographically disbursed throughout California, Mississippi, Ohio, New Jersey and North Carolina. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. Class Members are readily identifiable from information and records in the possession of Defendant and its authorized distributors and retailers.

262.     **Typicality**: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased the PFAS Makeup that was formulated, manufactured, marketed, advertised, distributed, and sold by Defendant. Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for the PFAS Makeup that was manufactured with potentially harmful, human-made chemicals, which makes the PFAS Makeup not what reasonable consumers were intending to purchase. Furthermore, the factual basis of Defendant's misconduct is common to all Class Members because it engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members.

263.     **Commonality**: Common questions of law and fact exist as to all Class Members. These questions predominate over questions that may affect only individual Class Members because Defendant acted on grounds generally applicable to all Class Members. Such common legal or factual questions include, *inter alia*:

a.   Whether the PFAS Makeup contains PFAS;

b.   Whether Defendant's practices in labeling and marketing the PFAS Makeup tends to mislead reasonable consumers into believing that the PFAS Makeup is clean and/or natural;

c.   Whether the PFAS Makeup is, in fact, clean and/or natural given that it contains PFAS;

d.   Whether Defendant omitted or failed to disclose material information to Plaintiffs and Class Members regarding the PFAS Makeup;

e.   Whether Defendant concealed from and/or failed to disclose to Plaintiffs and Class Members that harmful chemicals are used in its PFAS Makeup;

Whether Defendant breached the implied warranty of merchantability relating to the PFAS Makeup;

f.   Whether Defendant breached express warranties relating to the PFAS Makeup;

g.   Whether Defendant engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the PFAS Makeup containing harmful chemicals;

h.   Whether Defendant engaged in false or misleading advertising by selling and/or marketing the PFAS Makeup containing harmful chemicals;

i.   Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

j.   Whether Plaintiffs and Class Members either paid a premium for the PFAS Makeup that they would not have paid but for the false labeling and marketing of the PFAS Makeup or would not have purchased them at all;

k.   Whether Plaintiffs and the other Class Members have been injured and the proper measure of their losses as a result of those injuries; and

l.   Whether Plaintiffs and the other Class Members are entitled to injunctive, declaratory, or other equitable relief.

264.   **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer and product PFAS class actions, and Plaintiffs intend to prosecute this action vigorously.

265.   **Injunctive/Declaratory Relief**: The elements of Rule 23(b)(2) are met. Declaratory and injunctive relief is appropriate in this matter. Defendant has acted or refused to

act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to, or allow its resellers to, advertise, market, promote, and sell the Product in an unlawful and misleading manner, as described throughout this Complaint, and members of the Classes will continue to be misled, harmed, and denied their rights under the law.

266.    Plaintiffs have standing to make this claim because they may accidentally purchase another PFAS Makeup product provided that it was formulated without the PFAS. Defendant has acted and refused to act on grounds that apply generally to the Classes, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Classes as a whole.

267.    If Defendant is allowed to continue the practices of manufacturing, marketing and selling the PFAS Makeup with the PFAS, and failing to disclose the PFAS to consumers, unless injunctive or declaratory relief is granted, Plaintiffs and the Classes will not have a plain, adequate, speedy, or complete remedy at law to address all of the wrongs alleged herein.

268.    Plaintiffs further seek injunctive and declaratory relief requiring Defendant to cease its unfair, deceptive and unlawful conduct, including the following:

a. Undertake an immediate public information campaign to inform consumers the truth about the PFAS, including at the time of sale of the PFAS Makeup;

b. Adequately disclose the PFAS to consumers at the time of sale of the PFAS Makeup; and

c. Remove the PFAS.

269.    Plaintiffs also seeks a declaration that the PFAS Makeup contains PFAS, which existed at the time of sale of the PFAS Makeup to consumers, which was known to Defendant and unknown to consumers.

270.    Plaintiffs and Class Members have been harmed and will experience irreparable future harm should Defendant's conduct not be enjoined because they will be unable to properly replace their PFAS Makeup with clean and natural components or replacement PFAS Makeup, and will have to bear the costs associated with the PFAS if Defendant continues to fail and refuse to provide adequate remuneration to consumers as a result of the PFAS, which exists at the time of sale of the PFAS Makeup.

271.    **Predominance and Superiority**: Plaintiffs and Class Members all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of their individual claims, it is likely that few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

272.    Plaintiffs know of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

273.    Defendant acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes appropriate.

## COUNT I
### Breach of Implied Warranty
**(On Behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)**

274.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-273 as though fully set forth herein.

275.    Defendant is a merchant and was at all relevant times involved in the manufacturing, distributing, warranting, and/or selling of the PFAS Makeup.

276.    The PFAS Makeup are goods within the relevant laws and Defendant knew or had reason to know of the specific use for which the PFAS Makeup, as goods, were purchased.

277.    The implied warranty of merchantability included with the sale of each PFAS Makeup product means that Defendant warranted that the PFAS Makeup would be fit for the ordinary purposes for which the PFAS Makeup were used and sold, and were not otherwise injurious to consumers, that the PFAS Makeup would pass without objection in the trade, be of fair and average quality, and conform to the promises and affirmations of fact made by Defendant. This implied warranty of merchantability is part of the basis for the benefit of the bargain between Defendant, and Plaintiffs, and Class Members.

278.    Defendant breached the implied warranty of merchantability because the PFAS Makeup are not fit for their ordinary purpose of providing reasonably clean and natural makeup for consumers, *inter alia*, the PFAS Makeup contains potentially harmful chemicals which could reasonably be characterized as clean or natural.

279. The aforementioned problems associated with the PFAS Makeup constitute non-clean and unnatural makeup products, and therefore, there is a breach of the implied warranty of merchantability.

280. Defendant's warranty expressly applies to the original purchaser and any succeeding owner of the PFAS Makeup, creating privity between Defendant on the one hand, and Plaintiffs and Class Members on the other.

281. Nonetheless, privity is not required because Plaintiffs and Class Members are the intended beneficiaries of Defendant's warranties and its sale through retailers. Defendant's retailers were not intended to be the ultimate consumers of the PFAS Makeup and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were their intended beneficiaries.

282. More specifically, Defendant's intention that its warranties apply to Plaintiffs and Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including its warranty. Likewise, it was reasonably foreseeable that Plaintiffs and Class Members would be the intended beneficiaries of the PFAS Makeup and warranties.

283. Defendant impliedly warranted that the PFAS Makeup were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Makeup manufactured, supplied, distributed, and/or sold by Defendant were clean and/or natural; and (ii) a warranty that the PFAS Makeup would be fit for their intended use while they were being used by consumers.

284. Contrary to the applicable implied warranties, the PFAS Makeup, at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class

Members with clean and natural makeup. Instead, the PFAS Makeup suffered, and continues to suffer, from a formulation, design and/or manufacture, as alleged herein.

285.    Defendant's failure to adequately repair or replace the potentially harmful PFAS Makeup caused the warranty to fail in its essential purpose.

286.    Defendant breached the implied warranties because the PFAS Makeup were sold with the PFAS, which substantially reduced and/or prevented the PFAS Makeup from being clean and natural.

287.    As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**COUNT II**
**Breach of Express Warranty**
**(On Behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)**

288.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-273 as though fully set forth herein.

289.    Plaintiffs and Class Members purchased the PFAS Makeup either directly from Defendant or through retailers, such as ULTA, Sephora, Macy's and Nordstrom.

290.    Defendant is and was at all relevant times a "merchant" under U.C.C. § 2-313, and related State U.C.C. provisions.

291.    In connection with its sale of the PFAS Makeup, Defendant, as the designer, manufacturer, marketer, distributor or seller, expressly warranted that the PFAS Makeup were free from harmful chemicals by naming the product line "bareMinerals."

292.    Defendant's warranty representations consist of the brand name bareMinerals and the pervasive marketing campaign, including the representations described herein that are made online, and on its packaging.

293.    The express written warranties covering the PFAS Makeup were a material part of the bargain between Defendant and consumers. At the time it made these express warranties, Defendant knew reasonable consumers were purchasing the PFAS Makeup because they believed it to be as labeled and marketed.

294.    Each of the PFAS Makeup have an identical or substantially identical product representation(s) as they each contain the product name bareMinerals.

295.    Defendant breached its express warranties by selling the PFAS Makeup that were, in actuality, not free harmful chemicals like PFAS, as promised in the labeling and marketing. Defendant breached the warranty because it sold the PFAS Makeup with the PFAS, which was known to Defendant and unknown to consumers at the time of sale. Defendant further breached the warranty because it improperly and unlawfully denies valid warranty claims, and it has failed or refused to adequately repair or replace the PFAS Makeup with units that are actually as represented.

296.    Defendant breached its express warranty to adequately repair or replace the PFAS Makeup despite its knowledge of the PFAS, and/or despite its knowledge of alternative formulations, designs, materials, and/or options for manufacturing the PFAS Makeup.

297.    Defendant further breached its express written warranties to Plaintiffs and Class Members in that the PFAS Makeup contain harmful chemicals at the time they leave the manufacturing plant, and on the first day of purchase, and by failing to disclose and actively concealing this risk from consumers.

298.     The PFAS Makeup that Plaintiffs and Class Members purchased contained a PFAS chemical that is neither clean nor natural, loss of the product, loss of use of the product, and loss of the benefit of their bargain. Defendant's warranty expressly applies to the original purchaser and any succeeding owner of the PFAS Makeup for products purchased within the USA, creating privity between Defendant on the one hand, and Plaintiffs and Class Members on the other.

299.     Likewise, it was reasonably foreseeable that Plaintiffs and Class Members would be the intended beneficiaries of the PFAS Makeup and warranties, creating privity or an exception to any privity requirement. Plaintiffs and each of the Class Members are the intended beneficiaries of Defendant's warranties and its sale through retailers. The retailers were not intended to be the ultimate consumers of the PFAS Makeup and have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries of the PFAS Makeup.

300.     Defendant has been provided sufficient notice of its breaches of the express warranties associated with the PFAS Makeup.

301.     Upon information and belief, Defendant received further notice and has been on notice of its breach of warranties through its sale of PFAS Makeup and of its breaches of warranties through customer warranty claims reporting problems with Defendant, consumer complaints at various sources, and its own internal and external testing.

302.     As a direct and proximate result of Defendant's breach of its express written warranties, Plaintiffs and Class Members suffered damages and did not receive the benefit of the bargain and are entitled to recover compensatory damages, including, but not limited to the cost of inspection, repair, and diminution in value. Plaintiffs and Class Members suffered damages at

the point-of-sale stemming from their overpayment for the PFAS Makeup, in addition to loss of the product and its intended benefits.

## COUNT III
### Negligent Misrepresentation
**(On behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)**

303.    Plaintiffs re-allege paragraphs 1-273 above as if set forth fully in this Count.

304.    Pursuant to New York law, Plaintiffs must prove the following for a negligent misrepresentation claim: (1) a false statement of a material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiffs to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement.

305.    As a seller of the PFAS Makeup and a merchant, Defendant had a duty to give correct information to Plaintiffs and Class Members regarding the truth and accuracy of the ingredients of the PFAS Makeup. Defendant had sole possession and control of this information and had a duty to disclose it accurately to Plaintiffs and Class Members.

306.    Defendant represented that the PFAS Makeup was "clean" and "natural," when in reality, studies and testing have shown that it contained potentially harmful ingredients. Defendant knew, or should have known, that the PFAS Makeup contained non-clean and/or non-natural ingredients.

307.    Defendant supplied the information that the PFAS Makeup was "clean" and "natural" was known by Defendant to be desired by Plaintiffs and Class Members to induce them to purchase the PFAS Makeup. Defendant knew that making these representations would induce customers to purchase its makeup over the makeup of competitors.

308.     The Plaintiffs and Class Members relied upon the Defendant's representations that the PFAS Makeup was "clean" and "natural" when purchasing the PFAS Makeup. Further, this reliance was in fact to their detriment because the Plaintiffs and Class Members purchased the PFAS Makeup with harmful chemicals.

309.     Plaintiffs and Class Members are entitled to all relief the Court proper as a result of Defendant's actions described herein.

## COUNT IV
### Fraud
**(On behalf of Plaintiffs and the Nationwide Class and, In the Alternative, the State Subclasses)**

310.     Plaintiffs re-allege paragraphs 1-273 above as if set forth fully in this Count.

311.     Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

312.     Defendant knew or should have known that the PFAS Makeup contained potentially harmful ingredients, including PFAS chemicals.

313.     Defendant provided Plaintiffs and Nationwide Class Members with false or misleading material information and failed to disclose material facts about the true nature of the PFAS Makeup, including the fact that it contained ingredients which were not "clean" and/or "natural."

314.     Defendant had exclusive knowledge of the PFAS Makeup's ingredients at the time of sale and at all other relevant times. Neither Plaintiffs nor Nationwide Class Members, in the exercise of reasonable diligence, could have independently discovered the true nature of the PFAS Makeup prior to purchase.

315.     Defendant had the capacity to, and did, deceive Plaintiffs and Nationwide Class Members, into believing they were purchasing "clean" and/or "natural" makeup.

316.    Defendant undertook active and ongoing steps to conceal the presence of PFAS chemicals in the Products. Plaintiffs are not aware of anything in Defendant's advertising, publicity, or marketing materials that disclosed the truth about the PFAS Makeup, despite Defendant's awareness of the problem.

317.    The facts concealed and/or not disclosed by Defendant to Plaintiffs and Nationwide Class Members are material facts in that a reasonable person would have considered them important in deciding whether to purchase (or pay the same price for) the PFAS Makeup.

318.    Defendant intentionally concealed and/or failed to disclose material facts for the purpose of inducing Plaintiffs and Nationwide Class Members to act thereon.

319.    Plaintiffs and Nationwide Class Members justifiably acted or relied upon the concealed and/or nondisclosed facts to their detriment, as evidenced by their purchase of the PFAS Makeup.

320.    Plaintiffs and Nationwide Class Members suffered a loss of money in an amount to be proven at trial as a result of Defendant's fraudulent concealment and nondisclosure because they would not have purchased the PFAS Makeup, or would not have purchased the PFAS Makeup for the price they did, if the true facts concerning the PFAS Makeup had been known.

321.    Plaintiffs and Nationwide Class Members are entitled to all relief the Court proper as a result of Defendant's actions described herein.

## COUNT V
### Violation of the California Consumer Legal Remedies Act ("CLRA")
### California Civil Code §§ 1750, *et seq.*
### (On Behalf of Plaintiff Onaka and the California Class)

322.    Plaintiffs re-allege paragraphs 1-273 above as if set forth fully in this Count.

323.     The conduct described herein took place in the state of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumer Legal Remedies Act ("CLRA"), California Civil Code §§ 1750, *et seq*.

324.     The CLRA applies to all claims of Plaintiff Onaka and California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

325.     Plaintiff Onaka and California Class Members are "consumers" as defined by Civil Code § 1761(d).

326.     Defendant is a "person" as defined by California Civil Code § 1761(c).

327.     The PFAS Makeup qualifies as "goods" as defined by California Civil Code § 1761(a).

328.     Plaintiff Onaka and the California Class Members' purchases of the PFAS Makeup are "transactions" as defined by California Civil Code § 1761(e).

329.     As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer unlawful:

    a.     "Representing that goods...have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which they do no have." Civil Code § 1770(a)(5); and

    b.     "Representing that goods...are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

330.     Defendant engaged in unfair competition and/or unfair or deceptive acts or practices in violation of California Civil Code §§ 1770(a)(5) and (a)(7) when it represented, through its advertising and other express representations, that the PFAS Makeup had benefits or characteristics that it did not actually have.

331.    As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA, has made representations regarding the PFAS Makeup's benefits or characteristics that it did not in fact have, and has represented the PFAS Makeup to be of a quality that it was not. Indeed, Defendant concealed this information from Plaintiff Onaka and California Class Members.

332.    The PFAS Makeup was not and is not "clean" or "natural" for consumers. As detailed above, Defendant violated the CLRA when it falsely represented that the PFAS Makeup meets a certain standard or quality.

333.    Defendant further violated the CLRA when it advertised the PFAS Makeup with the intent not to sell it as advertised, and knew that the PFAS Makeup was not as represented.

334.    Specifically, Defendant marketed and represented the PFAS Makeup, *inter alia*, as being "free of harsh chemicals and unnecessary additives," "clean," and "pure" when in fact the PFAS Makeup contains PFAS chemicals known to be potentially harmful to humans.

335.    Defendant's deceptive practices were specifically designed to induce Plaintiff Onaka and California Class Members to purchase or otherwise acquire the PFAS Makeup.

336.    Defendant engaged in uniform marketing efforts to reach California Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use the PFAS Makeup manufactured by Defendant. Defendant's packaging, advertising, marketing, website, and retailer product identification and specifications contain numerous false and misleading statements regarding the quality and ingredients of the PFAS Makeup. These include, *inter alia*, the following misrepresentations contained in its advertising, marketing, social media platforms, and website:

- "Good-for-skin, 24-hour, lightweight, full coverage liquid foundation with a natural matte finish."

- "GOOD-FOR-SKIN INGREDIENTS"

- "With good-for-skin ingredients that won't clog pores, barePRO® Performance Wear Liquid Foundation is Makeup So Pure And Clean You Can Sleep in It™."

- "We're redefining performance wear with this new liquid mineral foundation that cares while it covers, improving the appearance of skin texture over time* while blurring pores and imperfections. The 24-hour breathable full coverage is powered by Mineral Lock™ Long-Wear Technology that blends mineral pigments with lipids naturally found in skin to lock in transfer-resistant, color-true coverage in 35 carefully calibrated shades."

- "CLEAN WITHOUT COMPROMISE"

- "Long before clean beauty became part of the collective consciousness, we were making clean, natural mineral makeup and skincare."

- "Purity in formulation and uncompromising performance have been our guiding principles since we launched in 1995."

- "[Contain] only what's needed, and nothing else."

- "At bareMinerals, our mission goes beyond makeup. We're here to help people feel good about themselves and their impact in the world. That's why we create clean, conscious beauty that's good to your skin, good for the community and good to the planet."

- "[Our Goal]: Be an industry leader in clean formulations . . . ."

337.    Despite these representations, Defendant omitted and concealed information and material facts from Plaintiff Onaka and California Class Members.

338.    In their purchase of the PFAS Makeup, Plaintiff Onaka and California Class Members relied on Defendant's representations and omissions of material facts.

339.    These business practices are misleading and/or likely to mislead consumers and should be enjoined.

340.    On November 2, 2021, Plaintiff Onaka provided written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions pursuant to the CLRA, but Defendant failed to take any corrective action.

341.     In accordance with California Civil Code § 1780(a), Plaintiff Onaka and the California Class Members seek injunctive and equitable relief for Defendant's violations of the CLRA, including an injunction to enjoin Defendant from continuing its deceptive advertising and sales practices.

342.     Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiff Onaka and California Class Members seek an order enjoining Defendant from the unlawful practices described above, a declaration that Defendant's conduct violates the Consumer Legal Remedies Act, money damages, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

**COUNT VI**
**Violations of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff Onaka and the California Class)**

343.     Plaintiffs re-allege paragraphs 1-273 above as if set forth fully in this Count.

344.     Plaintiff Onaka brings this count on behalf of herself and the California Class.

345.     Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

346.     Plaintiff Onaka and California Class Members who purchased the Defendant's PFAS Makeup suffered an injury by virtue of buying products in which Defendant misrepresented and/or omitted the PFAS Makeup's true quality and ingredients. Had Plaintiff Onaka and California Class Members known that Defendant materially misrepresented the PFAS Makeup and/or omitted material information regarding its PFAS Makeup and its ingredients, they would not have purchased the PFAS Makeup.

347.     Defendant's conduct, as alleged herein, violates the laws and public policies of the state of California and the federal government, as set out in the preceding paragraphs of this complaint.

348.    There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its PFAS Makeup.

349.    Plaintiff Onaka and California Class Members who purchased Defendant's PFAS Makeup had no way of reasonably knowing that the PFAS Makeup was deceptively packaged, marketed, advertised, and labeled; was not clean and/or natural; and was unsuitable for its intended use. Thus, Plaintiff Onaka and California Class Members could not have reasonably avoided the harm they suffered.

350.    Specifically, Defendant marketed, labeled, and represented the PFAS Makeup as being "clean," "pure," and "natural" when in fact the PFAS Makeup contains potentially harmful, human made, PFAS chemicals.

351.    The gravity of harm suffered by Plaintiff Onaka and California Class Members who purchased the PFAS Makeup outweighs any legitimate justification, motive, or reason for packaging, marketing, advertising, and/or labeling the PFAS Makeup in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous, and offend the established public policies of the state of California and the federal government. Defendant's actions are substantially injurious to Plaintiff Onaka and California Class Members.

352.    The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiff Onaka and California Class Members, were and are likely to deceive reasonable consumers by obfuscating the true nature of Defendant's PFAS Makeup, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

353.    Further, the acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

     a.   The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ *301 et seq*.; and

     b.   The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq*.

354.    As a result of Defendant's unlawful, unfair and fraudulent acts and practices, Plaintiff Onaka, on behalf of herself and the California Class, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law.

**COUNT VII**
**Violation of the California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq*.**
**(On Behalf of Plaintiff Onaka and the California Class)**

355.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-273 as though fully set forth herein.

356.    Plaintiff Onaka brings this count on behalf of herself and the California Class.

357.    The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq*.

358.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

359.    It is also unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

360.   Defendant, when it marketed, advertised, and sold the PFAS Makeup, represented to Plaintiff Onaka and California Class Members that it was clean, natural, and "good-for-skin," despite the fact that it contains potentially harmful, human-made PFAS chemicals.

361.   At the time of its misrepresentations, Defendant was either aware that the PFAS Makeup contained PFAS chemicals and was not clean or natural, or it was aware that it lacked the information and/or knowledge required to make such a representation truthfully.

362.   Defendant concealed, omitted, or otherwise failed to disclose this information to Plaintiff Onaka and California Class Members.

363.   Defendant's descriptions of the PFAS Makeup were false, misleading, and likely to deceive Plaintiff Onaka and other reasonable consumers.

364.   Defendant's conduct therefore constitutes deceptive or misleading advertising under the FAL.

365.   Plaintiff Onaka has standing to pursue claims under the FAL as she reviewed and relied on Defendant's packaging, advertising, representations, and marketing materials regarding the PFAS Makeup when selecting and purchasing the PFAS Makeup.

366.   In reliance on the statements made in Defendant's advertising and marketing materials, and Defendant's omissions and concealment of material facts regarding the quality and use of the PFAS Makeup, Plaintiff Onaka and the California Class Members purchased the PFAS Makeup.

367.   Had Defendant disclosed the true nature of the PFAS Makeup, specifically, the presence of PFAS chemicals therein, Plaintiff Onaka and California Class Members would not have purchased the PFAS Makeup or would have paid substantially less for it.

368.    As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including but not limited to money from Plaintiff Onaka and California Class Members who paid for the PFAS Makeup containing PFAS chemicals.

369.    Plaintiff Onaka and California Class Members seek injunctive relief, restitution, and disgorgement of any monies wrongfully acquired or retained by Defendant by means of its deceptive or misleading representations, including monies already obtained from Plaintiff Onaka and California Class Members as provided for by the Cal. Bus. & Prof. Code § 17500.

### COUNT VIII
**Violation of the Ohio Deceptive Trade Practices Act**
**Ohio Rev. Code §§ 4165.01, *et seq.***
**(On Behalf of Plaintiff Zeller and the Ohio Class)**

370.    Plaintiffs re-allege paragraphs 1-273 above as if set forth fully in this Count.

371.    Plaintiff Zeller brings this claim individually and on behalf of the Ohio Class.

372.    Defendant, Plaintiff Zeller, and Ohio Subclass members are a "person," as defined by Ohio Rev. Code § 4165.01(D).

373.    Defendant advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

374.    Defendant engaged in deceptive trade practices in the course of its business and vocation, in violation of Ohio Rev. Code § 4165.02, including:

    a.    Representing that its goods and services have characteristics, uses, benefits, or qualities that they do not have, in violation of Ohio Rev. Code § 4165.02(A)(7);

    b.    Representing that its goods and services are of a particular standard or quality when they are of another, in violation of Ohio Rev. Code § 4165.02(A)(9); and

    c.    Advertising its goods and services with intent not to sell them as advertise, in violation of Ohio Rev. Code § 4165.02(A)(11).

375.    Defendant's deceptive trade practices include, *inter alia*, representing its PFAS Makeup as "clean," and containing only "pure" ingredients when in reality the PFAS Makeup contains potentially harmful PFAS chemicals.

376.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff Zeller and Ohio Class Members, regarding the nature of the ingredients contained within the PFAS Makeup.

377.    Defendant intended to mislead Plaintiff and Ohio Class members and induce them to rely on its misrepresentations and omissions.

378.    Defendant acted intentionally, knowingly, and maliciously to violate Ohio's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff and Ohio Class Members' rights.

379.    As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff Zeller and Ohio Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

380.    Plaintiff Zeller and Ohio Class Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, attorneys' fees, and any other relief that is just and proper.

<u>**COUNT IX**</u>
**Violation of New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. §§ 56:8-1, *et seq.***
**(Plaintiff Ferguson Individually and on Behalf of the New Jersey Class)**

381.    Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-273 as though fully set forth herein.

382.     This claim is brought by Plaintiff Ferguson individually under the laws of New Jersey and on behalf of all other natural persons injured by Defendant's fraudulent consumer activity.

383.     Defendant is a "person," as defined by N.J. Stat. Ann. § 56:8-1(d).

384.     Defendant sells "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) & (e).

385.     Plaintiff Ferguson's purchase of the PFAS Makeup constituted a "sale" as defined by N.J. Stat. Ann. § 56:8-1(e).

386.     The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, et seq., prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise. It further prohibits the "advertisement as part of a plan or scheme not to sell the item or service so advertised." *Id.* § 56:8-2.2.

387.     Defendant's unconscionable and deceptive practices include:

   a. Manufacturing, distributing, marketing, advertising, and selling makeup containing PFAS, which was present at the points of sale;

   b. Failing to disclose the presence of PFAS in its products, despite the fact that it knew, or should have known, the makeup contained PFAS

   c. Defendant's knowledge that the presence of PFAS in the makeup was unknown to consumers, and would not be easily discovered by Plaintiff Ferguson and putative New Jersey Class Members, and would defeat their ordinary, foreseeable, and reasonable expectations concerning the performance of the PFAS Makeup

   d. Representing to consumers, including Plaintiff Ferguson and New Jersey Class Members, that the PFAS Makeup was clean and/or natural, when it contains PFAS chemicals;

   e. Actively concealing the presence of PFAS in the PFAS Makeup from consumers.

388.     Defendant's representations and omissions were material because they were likely to and did deceive reasonable consumers, including Plaintiff Ferguson and the New Jersey Class Members about the nature and quality of the PFAS Makeup.

389.     Defendant intended to mislead Plaintiff Ferguson and the New Jersey Class Members and induce them to rely on Defendant's misrepresentations and omissions in order to purchase the PFAS Makeup.

390.     Defendant acted intentionally, knowingly, and maliciously to violate New Jersey's Consumer Fraud Act, and recklessly disregarded Plaintiff Ferguson and the New Jersey Class Members' rights.

391.     As a direct and proximate result of Defendant's unconscionable and deceptive practices, Plaintiff Ferguson and the New Jersey Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property.

392.     Plaintiff Ferguson and New Jersey Class Members are entitled to a refund under N.J. Stat. Ann. § 56:8-2.12.

## COUNT X
**North Carolina Unfair Trade Practices Act,**
**N.C. Gen. Stat. Ann. § § 75-1.1, et seq.**
**(On Behalf of Plaintiff Bailey Individually and the North Carolina Class)**

393.     Plaintiffs hereby adopt and incorporate by reference the allegations contained in paragraphs 1-273 as though fully set forth herein.

394.     This claim is brought by Plaintiff Bailey individually under the laws of North Carolina and on behalf of the North Carolina Class.

395.     Defendant advertised, offered, or sold goods or services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. Ann. § 75-1.1(b).

396.    Defendant engaged in unfair and deceptive acts and practices in or affecting commerce, in violation of N.C. Gen. Stat. Ann. § 75-1.1, including:

    a.  Manufacturing, distributing, marketing, advertising, and selling makeup containing PFAS, which was present at the points of sale;

    b.  Omitting, concealing, or failing to disclose the material fact that harmful PFAS chemicals were present in the PFAS makeup, despite the fact that it knew, or should have known, the makeup contained PFAS;

    c.  Representing to consumers, including Plaintiff Bailey and North Carolina Class Members, that the PFAS Makeup was clean and/or natural when it contains potentially harmful, human made PFAS chemicals;

    d.  Actively concealing the presence of PFAS in the PFAS Makeup from consumers when Defendant knew that the presence of PFAS in the makeup was unknown to consumers, and would not be easily discovered by Plaintiff Bailey and putative North Carolina Class Members, and would defeat their ordinary, foreseeable, and reasonable expectations concerning the performance of the PFAS Makeup.

397.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the true nature of the PFAS Makeup, specifically that the makeup contains harmful PFAS chemicals in direct opposition to Defendant's claims that the PFAS Makeup is clean and natural.

398.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff Bailey and the North Carolina Class Members, into believing that the PFAS Makeup was in fact clean and natural.

399.    Defendant acted intentionally, knowingly, and maliciously to violate North Carolina's Unfair Trade Practices Act, and recklessly disregarded Plaintiff Bailey and North Carolina Class Members' rights.

400.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff Bailey and North Carolina Class Members have suffered monetary damages.

401.    Plaintiff and North Carolina Subclass members seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that this Court:

A.    Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Name Plaintiffs as Class Representatives of the Classes;

C.    Name Plaintiffs' counsel as Class Counsel for the Classes;

D.    Award damages, including compensatory, exemplary, and statutory damages, to Plaintiffs and the Classes in an amount to be determined at trial;

E.    Permanently enjoin Defendant from engaging in the wrongful and unlawful conduct alleged herein;

F.    Award Plaintiffs and the Classes their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

G.    Award Plaintiffs and the Classes pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

H.    Award such further relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: April 18, 2023          Respectfully submitted,

*/s/ Erin J. Ruben*
Erin Ruben*
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
eruben@milberg.com

Melissa S. Weiner
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone: (612) 389-0600
*mweiner@pwfirm.com*

Mitchell Breit
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
405 East 50th Street
New York, New York 10022
T: 347-668-8445
mbreit@milberg.com

Rachel Soffin**
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080
rsoffin@milberg.com

Harper T. Segui*
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
825 Lowcountry Blvd., Suite 101
Mt. Pleasant, SC 29464
T: 919-600-5000
hsegui@milberg.com

*\*Admitted pro hac vice*
*\*\*Application to be admitted pro hac vice is forthcoming*
*Attorneys for Plaintiffs & Proposed Classes*